UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
LOUISVILLE DIVISION

LOUISVILLE GAS AND ELECTRIC                                    Plaintiff
COMPANY

v.                                          Civil Action No. 3:25-cv-105-RGJ

BULLDOG DIVING, INC., et al.                                   Defendants

* * * * *

**MEMORANDUM OPINION & ORDER**

Defendant Bulldog Diving, Inc. ("Bulldog") moves to dismiss Counts I and II of Plaintiff

Louisville Gas and Electric Company's (LG&E) amended complaint. [DE 20]. LG&E responded

[DE 23], and Bulldog replied [DE 24]. Defendant Mitsui Sumitomo Insurance USA, Inc.

("Mitsui") also moves to stay proceedings. [DE 31-1]. LG&E and Bulldog responded, [DE 33; DE

34], and Mitsui replied [DE 36]. Briefing is complete and the matter is ripe. For the reasons below,

the Court **DENIES** Mitsui's motion to stay proceedings and **DENIES** Bulldog's motion to

dismiss.

### I.      BACKGROUND

#### A. The Parties and Relevant Agreements

Plaintiff LG&E is a utility company that provides natural gas and electricity to customers

in Kentucky. [DE 17 ¶ 14]. LG&E generates electricity at the Mill Creek Generating Station ("Mill

Creek"), which sits along the Ohio River and cools its equipment with water pulled in from the

river via underwater pumps. [*Id.* ¶¶ 15–16]. The pumps are situated in four underwater "pump

bays," which are separated from each other by concrete walls. [*Id.* ¶ 18]. While these walls have

openings in them, they can be closed by placing "stoplogs" in them, thus fully isolating the pump

1

bays from one another. [*Id.* ¶ 23]. Without a stoplog in place, adjoining pump bays can be accessed through the openings in the concrete walls. [*Id.* ¶ 24].

Because debris from the river often gets stuck in the underwater pump bays, LG&E regularly hires commercial divers to clean out the bays. [*Id.* ¶ 22]. Bulldog is a commercial dive company that began performing work for LG&E as early as 2004 and has since performed work for LG&E on numerous occasions. [*Id.* ¶¶ 26–42]. On June 7, 2016, Bulldog and LG&E entered into a 2016 General Commercial Agreement ("GCA"), a master contract that sets forth default terms and conditions for all contracts between the two parties. [*Id.* ¶ 45]. Relevant here, the GCA contains an indemnification provision, which provides:

> **15. __INDEMNITY__**. To the fullest extent permitted by Applicable Law, [Bulldog] shall indemnify, defend, and hold harmless the Company Indemnitees from all Claims and Liabilities, whether suffered directly by Company Indemnitees or indirectly by reason of third party Claims, to the extent arising or resulting from, or occasioned by or in connection with: (a) bodily injury and other personal injuries (including death) to Persons or damage to property resulting or alleged to have resulted from acts or omissions of any Contractor Party or otherwise from [Bulldog's] performance under this Contract, . . . (c) violations of any Applicable Laws by any Contractor Party, (d) Claims by any Governmental Authority arising from or in any matter relating to Contractor Parties' failure to comply with or remediate pursuant to any Applicable Law[.]

[DE 1-1 at 48]. The GCA also contains an insurance provision requiring Bulldog to "at its own expense, maintain and carry in full force and effect insurance reasonably acceptable" to LG&E. [*Id.* at 35, ¶ G4.1]. That provision also requires Bulldog to name LG&E as an "additional insured" on its insurance policies. [*Id.* at 36. ¶ G4.2]. At the time of the incident that gave rise to this litigation, Bulldog had a marine commercial liability policy (the "policy") with insurance company Mitsui. [DE 1-1 at 116].

On June 6, 2021, LG&E solicited a quote from Bulldog to inspect one of the Mill Creek pump bays for debris. [DE 17 ¶ 56]. Bulldog provided a quote, and the parties memorialized the

2

agreement in a purchase order ("PO") dated June 25, 2021. [*Id.* ¶¶ 57–59]. The PO for the Mill Creek work likewise contains an indemnity provision, providing that Bulldog "agrees to release, indemnify, hold harmless and defend [LG&E] . . . from and against any claim, liability, loss, and expense (including but not limited to attorney's fees) arising directly or indirectly out of or in connection with goods or services supplied under the order, including but not limited to those arising directly or indirectly out of or in connection with . . . injury to or death of persons[.]" [DE 1-1- at 60]. The PO also states that Bulldog's "indemnification obligations shall apply, regardless of whether the party to be indemnified was concurrently at fault but shall not apply if the party to be indemnified was solely at fault." [*Id.*]. Finally, the PO specifies that in the event of a conflict between the terms in the PO and the GCA, the GCA controls. [*Id.*].

B.  Accident and Aftermath

Pursuant to the PO, Bulldog sent a four-person team of certified divers to clear debris from the pump bay for pump #1 at the Mill Creek generating station on July 15, 2021. [DE 17 ¶ 65]. While removing debris, nineteen-year-old Bulldog diver Jaxxyn Wood ("Wood") came into contact with a pump in an adjoining bay and was tragically killed. [*Id.* ¶¶ 91–112]. No stoplog was in place between the pump bay in which Wood was working and the adjoining pump bay, and the pump in the adjoining bay was operational for the entirety of the dive. [*Id.* ¶¶ 107–09].

After Wood's death, the Kentucky Labor Cabinet Office of Occupational Safety and Health ("KOSHA") conducted an inspection and cited Bulldog as the "exposing employer" for numerous safety violations related to Bulldog's purported failure to ensure the safety of the facility for its divers, failure to plan for emergency procedures, and lack of communication with LG&E. [DE 17-1]. For instance, KOSHA cited Bulldog for "fail[ing] to obtain pertinent information regarding the dive site," such as "information on the layout/configuration of the facility and the fact that isolation

3

of bays by means of stoplogs was not conducted, nor possible[.]" [*Id.* at 444]. KOSHA also cited Bulldog for "fail[ing] to verify de-energization and isolation of hazardous machinery prior to an employee entering the vicinity of the hazard to perform work" and for failing to "effectively coordinate with the host employer, [LG&E] to minimize hazards presented to the dive team[,]" among others. [*Id.* at 446, 451]. KOSHA also cited LG&E as the "creating, controlling, and correcting employer" for failing to provide Bulldog with adequate information about the facility, failing to identify hazards, and failing to ensure stoplogs were available to isolate the pump bays, among other numerous citations. [DE 1-1 at 95–105]. After LG&E contested the citations and penalties, KOSHA initiated an enforcement proceeding, which LG&E is still defending. [DE 23 at 548].

On July 14, 2022, Bryan Wood, Individually and as Administrator of the Estate of Jaxxyn Wood, filed a civil action against LG&E in Jefferson Circuit Court (the "Wood lawsuit") for: (1) negligence and wrongful death; (2) negligent misrepresentation; (3) negligence per se; and (4) punitive damages. [DE 1-1 at 64–81]. Prior to a scheduled mediation in the Wood lawsuit, LG&E sent a letter to Bulldog demanding that Bulldog acknowledge its contractual obligation to indemnify, defend, and hold harmless LG&E from and against the claims against LG&E in the Wood lawsuit and the KOSHA proceeding. [DE 1-1 at 108]. LG&E also requested that Bulldog confirm that LG&E was named as an insured on Bulldog's liability insurance, and that Bulldog's insurer had been notified of the claims in the Wood Lawsuit and the KOSHA proceeding. [*Id.* at 110–11]. In a letter dated November 15, 2024, Bulldog's counsel responded to LG&E and rejected LG&E's demand for defense and indemnity. [*Id.* at 113]. Shortly thereafter, Mitsui sent a letter to LG&E denying coverage on the grounds that LG&E did not qualify as an additional insured under Bulldog's policy. [*Id.* at 118–19].

4

C. <u>This Lawsuit</u>

On December 11, 2024, LG&E settled the claims with the Wood estate. [DE 17 ¶ 154]. In turn, LG&E filed suit against Bulldog in Jefferson Circuit Court, seeking a judgment of indemnification against Bulldog regarding the settlement of the Wood Lawsuit and the KOSHA proceeding. [DE 1-1 at 8–17]. Bulldog removed the case to this Court on February 24, 2025. [DE 1]. On March 26, 2025, Bulldog filed its first motion to dismiss, and Mitsui simultaneously filed a lawsuit in the Southern District of New York ("SDNY") seeking a declaratory judgment that (1) it has no duty to indemnify and defend Bulldog in this Court proceeding; (2) the insurance policy does not provide coverage for claims asserted in this Court; and (3) LG&E does not qualify as an additional insured under the policy. [DE 31-3 ¶ 62]. After Mitsui filed suit in New York, Bulldog and LG&E jointly moved to stay briefing on Bulldog's motion to dismiss in this Court to allow LG&E to amend its complaint to add Mitsui as defendant. [DE 13]. LG&E then filed its amended complaint in this Court on June 1, 2025. [DE 17]. On February 13, 2026, the SDNY court transferred Mitsui's declaratory judgment action to this Court. [DE 43-1].

In its amended complaint, LG&E asserts the following claims: (1) contractual indemnity and defense against Bulldog; (2) breach of contract against Bulldog; and (3) breach of contract against Mitsui. [*Id.* ¶¶ 157–209]. LG&E maintains that, under the terms of the contracts, Bulldog was required to indemnify, defend, and hold harmless LG&E from and against the claims in the Wood Lawsuit and the KOSHA proceeding. [*Id.* ¶¶ 160–61]. LG&E also maintains that Bulldog failed to fulfill its contractual obligations with LG&E by failing to comply with OSHA regulations, failing to adequately inspect the job site, and failing to adopt suitable precautions, among other failures, and that its refusal to indemnify LG&E was a breach of contract. [*Id.* ¶¶ 176, 183]. Finally, LG&E claims that Mitsui wrongfully denied coverage to LG&E. [*Id.* ¶¶ 202–07].

## II.      DISCUSSION

A.  Motion to Stay

The decision to stay a proceeding "ordinarily rests with the sound discretion of the District Court." *Ohio Env't Council v. U.S. Dist. Ct., S. Dist. of Ohio, E. Div.*, 565 F.2d 393, 396 (6th Cir. 1977). However, because "a party has a right to a determination of its rights and liabilities without undue delay," courts must "tread carefully in granting a stay of proceedings." *Id.* The party seeking the stay has the burden to show that there is a "pressing need for delay, and that neither the other party nor the public will suffer harm from entry of the order." *Id.* If there is even a "fair possibility" that the stay will harm the non-moving litigant, the movant must then "make out a clear case of hardship or inequity" to go forward. *Id.* While the most important factor for the Court to consider in deciding a motion to stay is the balance of hardships to the parties, it "must also consider whether granting the stay will further the interest in economical use of judicial time and resources." *FTC v. E.M.A. Nationwide, Inc.*, 767 F.3d 611, 628 (6th Cir. 2014) (quoting *Int'l Bhd. of Elec. Workers, Loc. Union No. 2020, AFL-CIO v. AT&T Network Sys. (Columbia Works)*, 879 F.2d 864 (6th Cir. 1989) (table)). Relevant to this consideration is "the potentiality of another case having a dispositive effect on the case to be stayed [and] the judicial economy to be saved by waiting on a dispositive decision . . . ." *Michael v. Ghee*, 325 F. Supp. 2d 829, 831 (N.D. Ohio 2004) (citing *Landis v. North Am. Co.*, 299 U.S. 248, 255 (1936).

Mitsui moves to stay proceedings in this Court "until the motions pending in the SDNY Lawsuit are decided." [DE 31-1 at 751]. Mitsui maintains that the "question of the proper venue for the resolution of the insurance coverage dispute" is already before the SDNY court, and that, if this matter is not stayed, Mitsui will move to transfer the claims against it to the SDNY, which would "necessarily place the same issue before this Court that is already under consideration by

6

the Court in the SDNY." [DE 31-1 at 750]. In other words, Mitsui's argument that this proceeding should be stayed rests entirely on the fact that it had a parallel declaratory judgment action in the SDNY, in which LG&E and Bulldog had moved to transfer venue. [DE 31-1 at 748]. The SDNY has since granted those motions to transfer, so Mitsui's declaratory judgment action is now before this Court. *See Mitsui Sumitomo Insurance USA, Inc. v. Bulldog Diving, Inc., et al.*, Civil Action No 3:26-cv-109-RGJ. Accordingly, Mitsui's argument that proceeding with this case would result in duplicative decision-making and conflicting results on the issue of proper venue is no longer pertinent, and the motion to stay proceedings is moot. Mitsui offers no other arguments in support of its motion to stay proceedings and does not suggest that any hardship would result to it by proceeding with this action. As a result, the Court will deny Mitsui's motion to stay.

    B.  <u>Motion to Dismiss</u>

    Bulldog moves to dismiss Counts I and II of LG&E's amended complaint for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6). [DE 20]. With respect to Count I, Bulldog argues, first, that the indemnification provisions of the GCA and PO do not apply to the Wood lawsuit or the KOSHA proceeding. [*Id.* at 526]. It also argues that even if the indemnifications provisions apply, they are unenforceable under Kentucky law. [*Id.* at 531]. As to Count II, Bulldog argues that LG&E has no plausible breach of contract claim because—contrary to LG&E's allegation—Bulldog did "obtain the contractually required insurance policy listing LG&E as an additional insured," as shown by the Mitsui letter attached to LG&E's original complaint. [*Id.* at 534]. LG&E maintains that the broad language of the indemnity provisions applies to both the Wood lawsuit and the KOSHA proceeding, that the indemnification provision is enforceable, and that the Mitsui letter does not show that Bulldog has complied with its contractual obligation to name LG&E as an additional insured. [DE 23 at 549–54, 556, 560].

*1. Standard*

Federal Rule of Civil Procedure 8(a) requires that a complaint contain a "short and plain statement of the claim showing that the pleader is entitled to relief." A motion to dismiss under Fed. R. Civ. P. 12(b)(6) tests the legal sufficiency of the complaint. *RMI Titanium Co. v. Westinghouse Elec. Corp.*, 78 F.3d 1125, 1134 (6th Cir. 1996). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (*quoting Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A claim is plausible on its face "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citing *Twombly*, 550 U.S. at 556). This standard does not "impose a probability requirement at the pleading stage; it simply calls for enough fact to raise a reasonable expectation that discovery will reveal evidence of illegal [conduct]." *Twombly*, 550 U.S. at 556. Dismissal under Rule 12(b)(6) is warranted "only if it appears beyond doubt that the plaintiff can prove no set of facts in support of the claims that would entitle him or her to relief." *Zaluski v. United Am. Healthcare Corp.*, 527 F.3d 564, 570 (6th Cir. 2008).

Because a motion to dismiss challenges the sufficiency of the pleadings, "[i]t is not the function of the court [in ruling on such a motion] to weigh evidence." *Miller v. Currie*, 50 F.3d 373, 377 (6th Cir. 1995). Rather, to determine whether the plaintiff set forth a "plausible" claim, the Court "must construe the complaint liberally in the plaintiff's favor and accept as true all factual allegations and permissible inferences therein." *Gazette v. City of Pontiac*, 41 F.3d 1061, 1064 (6th Cir. 1994). Yet the Court is "not bound to accept as true a legal conclusion couched as a factual allegation"; "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 555).

8

In deciding a motion to dismiss, the Court "may consider the Complaint and any exhibits attached thereto, public records, items appearing in the record of the case and exhibits attached to defendant's motion to dismiss so long as they are referred to in the Complaint and are central to the claims contained therein." *Bassett v. Nat'l Collegiate Athletic Ass'n*, 528 F.3d 426, 430 (6th Cir. 2008) (citation omitted). "A complaint will be dismissed . . . if no law supports the claims made, if the facts alleged are insufficient to state a claim, or if the face of the complaint presents an insurmountable bar to relief." *Southfield Educ. Ass'n v. Southfield Bd. of Educ.*, 570 F. App'x 485, 487 (6th Cir. 2014) (citing *Twombly*, 550 U.S. at 561–64).

### 2.  *Count I – Contractual Indemnity and Defense*

#### i.  **Scope of Indemnification Provision**

Bulldog first argues that the indemnification terms do not apply in this case. It maintains that, for bodily injury or death claims such as the Wood lawsuit, the GCA's indemnification obligation arises only for claims "resulting or alleged to have resulted from acts or omissions of any [Bulldog] Party or otherwise from [Bulldog's] performance under this Contract." [DE 20 at 527]. It further asserts that the indemnification provision in the GCA is triggered only by a "claim," and that the underlying claim in this case—the Wood lawsuit—alleges misconduct by LG&E only. [*Id.* at 527–28]. Accordingly, the underlying claim is not "alleged to have resulted from" that acts or omissions of Bulldog, so the indemnification cannot apply to the Wood lawsuit. [*Id.* at 529]. Bulldog makes a similar argument regarding indemnification for the KOSHA proceeding. It maintains that, for claims for a violation of law or a claim by a governmental authority, "indemnity is only triggered by a Bulldog violation or Bulldog conduct" and that "nothing in the KOSHA Complaint refers to any conduct of Bulldog." [*Id.* at 529].

9

With respect to the Wood lawsuit, LG&E responds that the contract language requires indemnity for *all* liability resulting from Bulldog's performance of the work, including liability arising from the indemnitee's—LG&E's—own negligence. [DE 23 at 550–52]. LG&E also disputes Bulldog's contention that LG&E's right to indemnity rests only on the allegations in the underlying Wood lawsuit and instead argues that the right rests on the facts about the incident alleged in the amended complaint. [*Id.* at 553–54]. With respect to the KOSHA proceeding, LG&E points out that the indemnification provision applies to "[c]laims by any Governmental Authority arising from or in any matter relating to [Bulldog's] failure to comply with or remediate pursuant to any Applicable Law[.]" [*Id.* at 555; DE 1-1 at 48]. Because the KOSHA proceeding involves claims "arising from" or "relating to" Bulldog's violations of safety regulations, LG&E maintains that Bulldog has indemnity obligations for the proceeding under the terms of the GCA. [*Id.* at 555].

### a.   Wood Lawsuit

LG&E seeks indemnification and defense under Kentucky law for attorneys' fees and other costs incurred in defending and settling the Wood lawsuit. [DE 17 at 436]. Both the 2016 GCA and the 2021 PO govern the scope of Bulldog's indemnity obligations to LG&E.[1] The indemnity term in the GCA provides that:

> [t]o the fullest extent permitted by Applicable Law, [Bulldog] shall indemnify, defend, and hold harmless [LG&E] from all Claims and all Liabilities . . . to the extent arising or resulting from, or occasioned by *or in connection with* . . . bodily and other personal injuries (including death) to Persons or damage to property resulting or alleged to have resulted from acts or omissions of any [Bulldog] Party *or otherwise from [Bulldog's] performance under this Contract.*

[DE 1-1 at 48, ¶ 15 (emphasis added)]. The agreement defines "claims" as "claims, causes of action, proceedings, demands or suits." [DE 1-1 at 31]. It defines "liabilities" as "all judgments,

---

[1] The parties' briefs largely focus on the language of the GCA's indemnity provision because the PO states that the GCA controls in the event of a conflict between the terms of the two agreements. The Court will do the same here.

liabilities, losses, costs, expenses, damages, fines or penalties, court costs, reasonable attorneys' fees and costs, and pre- and post-judgment interest." [*Id.* at 33]. The language of the provision therefore requires Bulldog to indemnify LG&E for liabilities and losses *in connection with* bodily injury or death resulting from Bulldog's acts *or otherwise from Bulldog's performance* under the contract.

This contractual language mirrors that of the contract in *Fosson v. Ashland Oil & Ref. Co.*, 309 S.W.2d 176 (Ky. 1957). There, Kentucky's highest court considered whether the owner of an oil and refining company had stated a claim for indemnification against a contractor whose employee was electrocuted while working on a tank on the owner's property. *Id.* at 177. The court considered the following language in the construction contract:

> The Contractor shall indemnify the Owner against all claims, demands, liens, taxes, loss or damages of any character suffered by the Owner and shall save the Owner harmless from all liability growing out of or incurred in the prosecution of said work or arising from any operations, acts, or omissions of Contractor.

*Id.* The contractor argued that this wording limited the contractor's liability for indemnification to damages arising only from its own operations, acts, or negligence. *Id.* at 178. The court, however, found that the use of the word "or" reflected an intent for the owner to be indemnified for "all liability incurred in the prosecution of the work or later growing out of the contractor's acts or omissions." *Id.*

Much like the contractual language at issue in *Fosson*, the use of the word "or" in the GCA's indemnity provision suggests an intent for LG&E to be indemnified for all liability incurred in connection with Bulldog's performance of the work. Focusing on the language that follows the two disjunctive "ors," the GCA indemnity provision applies to "all Claims and Liabilities . . . occasioned . . . in connection with . . . personal injuries (including death) to Persons . . . from [Bulldog's] performance under this Contract[.]" [DE 1-1 at 48. ¶ 15]. The language therefore

11

encompasses *all* liability LG&E incurred in connection with injuries from Bulldog's performance under the contract, not only liability incurred as a result of Bulldog's own acts.

Bulldog argues that the terms of the indemnity provision in *Fosson* are broader than those here, noting that the provision in *Fosson* extended to "all claims, demands, liens, taxes, loss or damages of any character suffered by the Owner," while the provision here only extends to "claims" and "liabilities," not to "loss" or "damages." [DE 24 at 568]. However, the GCA expressly defines "liabilities" as "all judgments, liabilities, *losses*, costs, expenses, *damages*, fines or penalties, court costs, reasonable attorneys' fees and costs, and pre- and post-judgment interest." [DE 1-1 at 31 (emphasis added)]. The GCA's use of "all Claims and Liabilities" therefore serves the same function as *Fosson*'s use of "all claims, demands, liens, taxes, loss or damages."

Bulldog's argument that LG&E's right to indemnification is triggered only by the allegations in the underlying Wood complaint also fails. Bulldog argues that the "indemnification obligation under the GCA is triggered by a *claim*" and that the claim in this case—the Wood lawsuit—only raises allegations against LG&E, so the obligation is not triggered. [DE 20 at 527]. Kentucky's highest court held otherwise in *Fosson*. That case similarly involved an underlying claim in which the deceased's estate sued only the owner/indemnitee, not the contractor who employed the deceased. *Fosson*, 309 S.W.2d at 177. The court nevertheless found that the owner was entitled to indemnification from the contractor—even when the underlying claim raised no allegations against the contractor. *Id.* at 178; *see also Enerfab, Inc. v. Kentucky Power Co.*, 433 S.W.3d 363, 366 (Ky. App. 2014) (disagreeing with contractor's argument that it was not obligated to indemnify the owner for claims resulting from an employee's injury when the employee's underlying lawsuit alleged claims only against the owner).

12

Pursuant to binding Kentucky law, the indemnification provision in the GCA encompasses not only claims or liabilities resulting directly from Bulldog's own negligence, but also those generally incurred from Bulldog's performance of the contract. As a result, the fact that the underlying Wood lawsuit raised allegations only against LG&E does not preclude indemnification.

b. KOSHA Proceeding

LG&E also seeks indemnification for the ongoing KOSHA proceeding, which involves LG&E's alleged violations of safety regulations related to Wood's accident. [DE 17 at 434; DE 1-1 at 91]. Bulldog maintains that "this is not a claim for bodily injury or death, and instead is either a claim for a violation of law or a claim by a governmental authority," so "indemnity is only triggered by a Bulldog violation or Bulldog conduct." [DE 20 at 529].

Even accepting Bulldog's argument that the KOSHA proceeding does not constitute a claim for bodily injury or death, however, the GCA's indemnity provision extends to "[c]laims by any Governmental Authority arising from or in any matter related to [Bulldog's] failure to comply with or remediate pursuant to any Applicable Law[.]" [DE 1-1 at 48, ¶ 15]. The indemnity right therefore extends to a government claim that is "in any matter" related to Bulldog's failure to comply with a law. Under Kentucky law, the Court must interpret contractual language according to its "plain and ordinary meaning." *Nationwide Mut. Ins. Co. v. Nolan*, 10 S.W.3d 129, 131 (Ky. 1999). Here, the plain language of this provision does not limit indemnification to government claims that specifically identify Bulldog. Rather, it broadly encompasses claims that are merely *related* to the Bulldog's failure to comply with "any Applicable Law." The GCA then defines "applicable laws" as "any applicable statute, law (including common law), rule, treaty, regulation, code, ordinance, court order, executive order, or the like, when enacted, adopted, issued or promulgated by a Governmental Authority . . . ." [DE 1-1 at 31]. In the amended complaint, LG&E

13

alleges numerous facts demonstrating Bulldog's failure to comply with safety regulations related to the Wood incident. [DE 17 ¶¶ 113–135]. For instance, LG&E alleges that Bulldog was cited by KOSHA for failing to obtain pertinent information regarding the dive site, in violation of 29 C.F.R. § 1910.146(c)(9)(i) [*Id.* ¶ 115]. While the KOSHA citations against LG&E do not specifically identify Bulldog as a wrongdoer, LG&E has sufficiently alleged that the KOSHA citations "relate to" Bulldog's failure to comply with applicable laws, which is all that is required under the indemnification provision.

### ii.    Enforceability of Indemnification Provision

Bulldog next argues that even if the scope of the indemnification provision encompasses the claims in this case, the terms are nonetheless unenforceable for three reasons. [DE 20 at 531]. First, Bulldog maintains that the provision is unenforceable under the Kentucky Supreme Court case *Hargis v. Baize*, in which the court held that "[a] party cannot contract away liability for damages caused by that party's failure to comply with a duty imposed by a safety statute." 168 S.W.3d 36, 47 (Ky. 2005). Bulldog maintains that KOSHA duties cannot be "transferred to another party via an exculpatory provision in a contract" because this would have the effect of insulating the indemnitee from liability for violating public safety statutes, which is contrary to public policy. [DE 20 at 531]. Bulldog therefore contends that the indemnification provision is unenforceable because it attempts to contract away LG&E's liability for Wood's underlying negligence *per se* claims, which are based on violations of KOSHA provisions. [*Id.* at 531–32]. In response, LG&E argues that, unlike the contract in *Hargis*, the contract here "is not a pre-injury release that prohibits an employee form pursuing claims and recovering damages for alleges safety violations." [DE 23 at 557].

14

In *Hargis*, the court addressed the validity of an exculpatory contract that exempted the owner of a lumber yard from any liability for damages suffered by a contractor as a result of the owner's violation of safety statutes. 168 S.W.3d at 46–47. The court refused to hold that such agreements were invalid *per se*, but stated that "such contracts are disfavored and are strictly construed against the parties relying upon them." *Id.* at 47. As LG&E notes, however, unlike the contract in *Hargis*, the contract here is not styled as pre-injury release that "prohibits an employee from pursuing claims and recovering damages for alleged safety violations." [DE 23 at 557]. LG&E points out that Wood's estate was not prevented from recovering workers' compensation payments and suing LG&E for damages in tort. [*Id.*]. It maintains that Kentucky law allows parties to "shift *between each other* the risk of loss resulting from violations of safety statutes that relate to the work performed under the contract." [*Id.*]. For instance, in *Cumberland Valley Contractors, Inc. v. Bell Cnty. Coal Corp.*, the Kentucky Supreme Court found that an exculpatory clause was valid, largely because "no significant disparity in bargaining power existed between the contracting parties in the instant case, unlike most cases in which exculpatory clauses were deemed invalid due to safety statute violations or other public policy concerns." 238 S.W.3d 644, 651 (Ky. 2007). Rather, the exculpatory provision was the result of an "arm's-length transaction between sophisticated parties with equal bargaining power." *Id.* The court therefore found that there was "no reason to disturb the parties' agreement to shift the risk of loss for any violation of a statutory duty, which they both share." *Id.*

In *Speedway Superamerica, LLC v. Erwin*, the Kentucky Court of Appeals analyzed *Hargis*, *Cumberland Valley*, and *Fosson*, and concluded that the lines of reasoning employed in the three cases are "entirely consistent" with one another. 250 S.W.3d 339, 344 (Ky. App. 2008). The court explained that the enforceability of a provision that limits a party's liability depends not

15

on whether that provision is a pre-injury release or an indemnification provision, but on whether there was a disparity of bargaining power between the two parties. *Id.* at 341–42. The court explained that "where a party uses an indemnification provision to defend against its own negligence, any distinction between a pre-injury release and an indemnification provision can become . . . analytically negligible." *Id.* at 341. The court then set forth the rule that "such provisions, whether pre-injury releases or indemnification provisions applied to defend against the indemnitee's own negligence, are not against public policy generally, but they are when agreed to by a party in a clearly inferior bargaining position." *Id.* at 344.

Because LG&E uses the provision here to reduce its own liability for negligence or statutory violations, it is "analytically negligible" whether the provision is an indemnification provision or a pre-injury release. Rather, the "key factor" is the "relative bargaining power" of Bulldog and LG&E—the parties who agreed to the provision. *See id.* at 341–42 ("[A] key factor, perhaps *the* key factor, in the analysis of both pre-injury releases and indemnification provisions used to defend the indemnitee's own negligence, is the relative bargaining power of the parties who enter into them."). The relative bargaining power of the parties is a question of fact more appropriately addressed at the summary judgment stage. From the amended complaint alone, it is not clear that Bulldog lacked sufficient bargaining power and therefore that the indemnity provision is unenforceable.

Second, Bulldog argues that the indemnification claim is "barred by the exclusive remedy provision of Kentucky's Workers' Compensation Act." [DE 20 at 532]. It points out that the Kentucky Workers' Compensation Act grants immunity to employers for liability arising under common law, and parties can only escape that immunity by way of contract in which they agree to share liability. [*Id.* at 532–33]. LG&E maintains that the parties have appropriately contracted

16

to share liability in a different manner, which is permitted under the exclusive remedy provision.

[DE 23 at 558–59].

> The exclusive remedy provision of the Workers' Compensation Act provides that
>
> If an employer secures payment of compensation as required by this chapter, the liability of such employer under this chapter shall be exclusive and in place of all other liability of such employer to the employee, his legal representative, husband or wife, parents, dependents, next of kin, and anyone otherwise entitled to recover damages from such employer at law or in admiralty on account of such injury or death. The liability of an employer to another person who may be liable for or who has paid damages on account of injury or death of an employee of such employer . . . shall be limited to the amount of compensation and other benefits for which such employer is liable under this chapter . . . , *unless such other and the employer by written contract have agreed to share liability in a different manner*.

KRS 342.690(1) (emphasis added). The provision "immunizes an employer who secures the payment of workers' compensation benefits from tort liability for an employee's work-related accident and limits the employer's liability to worker's compensation benefits." *Lab. Ready, Inc. v. Johnston*, 289 S.W.3d 200, 203 (Ky. 2009). However, the provision also allows parties to agree to "share liability in a different manner" through a written contract. KRS 342.690(1). Pursuant to this language, Kentucky courts have found that indemnity actions akin to the one here are not contrary to KRS 342.609(1). *See Lab. Ready*, 289 S.W.3d at 208 ("KRS 342.690(1) clearly permits employers . . . to agree to share an employer's liability for damages in a manner different from that set forth in the statute, provided they do so by written contract. Thus, we are not convinced that a contractual indemnity provision must be viewed as being abhorrent to Chapter 342."); *see also Union Carbide Corp. v. Sweco, Inc.*, 610 S.W.2d 932, 934 (Ky. App. 1980).

Bulldog attempts to evade KRS 342.690(1)'s carve-out for written contracts by arguing that the carve-out only applies when the parties each agree to assume some amount of liability, not where the parties agree to shift *all* liability. [DE 20 at 532; DE 23 at 559]. Focusing on the word "share" in the statute, Bulldog maintains that "[t]here is no sharing of liability in LG&E's

17

contracts" and that LG&E "takes the position that its indemnity terms shift *all* of the tort liability for an injury or death to a Bulldog employee to Bulldog." [DE 20 at 532]. In other words, Bulldog believes that parties can contract out of KRS 342.609(1) only if the terms apportion some amount of liability to both parties. The Court does not read the word "share" in this manner, however. Black's Law Dictionary defines "share" as "[t]o divide (something) into portions." *Share*, *Black's Law Dictionary* (12th ed. 2024). Using this definition, the statute simply requires the contract to divide liability into portions among the parties; it does not preclude apportionment of all liability to one party. Bulldog cites to no case the supports its interpretation of "share liability;" it simply maintains that the legislature could have used the term "address liability" if it intended the carve-out to apply to any contractual provision that apportions liability. [DE 24 at 571]. The Court is unconvinced by Bulldog's narrow interpretation of the word "share," particularly when this reading would significantly hinder the parties' freedom to contract to allocate liability as they wish. *See Cumberland Valley*, 238 S.W.3d at 650 ("Recognizing the importance of freedom to contract, the courts of this Commonwealth have traditionally enforced exculpatory provisions unless such enforcement violates public policy.").

Third, Bulldog argues that "the law does not permit enforcement of indemnity agreements for gross negligence or intentional misconduct," and because the complaint in the underlying Wood lawsuit alleges gross negligence, LG&E's indemnity agreement is unenforceable. [DE 20 at 533]. In making this argument, Bulldog cites a series of out-of-state cases and notes that "Kentucky law on this point appears unsettled." [DE 20 at 533, n.3]. On the contrary, "Kentucky courts have long upheld exculpatory clauses in arm's-length transactions between sophisticated parties with equal bargaining power and allowed such parties to bargain against liability for their

18

own negligence and *even gross negligence . . . .*" *Cumberland Valley*, 238 S.W.3d at 654 (emphasis added).

Regardless of whether indemnity agreements for gross negligence are unenforceable, whether LG&E committed gross negligence is a question of fact not appropriate for resolution at the motion to dismiss stage. While the underlying Wood complaint alleged gross negligence by LG&E, that is not equivalent to a finding that LG&E in fact committed gross negligence. In *Thompson v. Budd Co.*, the Sixth Circuit considered a contractual indemnity provision that specified that the indemnity obligation did "not apply to the extent that losses are clearly shown to have resulted solely and directly from gross negligence or willful misconduct of such indemnitee." 23 F. App'x 239, 240 (6th Cir. 2001). After finding that the indemnification provision could be triggered even when the parties had not been held liable to the underlying plaintiff, the court remanded the case to the district court to make the "factual determination" of whether the indemnitee was grossly negligent or engaged in willful misconduct. *Id.* at 243. Accordingly, even if an indemnification agreement for gross negligence is unenforceable, the Court would not dismiss the claim at this stage, when the fact of LG&E's gross negligence has not been established.

The Court therefore rejects Bulldog's argument that LG&E has failed to state a claim for indemnification and defense. As a result, the Court denies Bulldog's motion to dismiss as to Count I of the amended complaint.

### 2. *Count II – Breach of Contract*

Bulldog argues that Count II of LG&E's amended complaint should be dismissed because a letter from Mitsui to LG&E shows that Bulldog "did in fact obtain a policy of commercial liability insurance naming LG&E as an additional insured," which refutes LG&E's claim that Bulldog breached its contractual obligation to list LG&E as an additional insured. [DE 20 at 534].

19

The amended complaint alleges several breaches of contract by Bulldog. [DE 17 ¶¶ 179–84]. Bulldog appears to challenge only the allegation in paragraph 184 of the amended complaint, which states:

> In the event it is determined that LG&E is not covered as an additional insured under the Mitsui Policy with respect to the Wood Lawsuit and the KOSHA Proceeding, Bulldog's failure to ensure that LG&E was named as an additional insured on Bulldog's liability insurance prior to the Incident, as required by the Contract, constitutes a separate, additional breach of contract by Bulldog.

[*Id.* ¶ 184]. Bulldog argues that this allegation fails because the letter from Mitsui, which was attached to the original complaint, states that "Mitsui . . . issued . . . a 'Marine Commercial Liability' policy to Named Assured "Bulldog Diving Inc." and "[t]he Policy includes 'Additional Insured & Waiver of Subrogation (Blanket)' endorsement." [DE 20 at 534; DE 1-1 at 118]. The letter also states that the policy provides additional insured status to "any person or organization as an Insured under this policy to the extent [Bulldog is] obligated by an "insured contract" to include them as Additional Assureds[.]" [DE 1-1 at 118]. An "insured contract" is defined as a contract "under which [Bulldog] assume[s] the tort liability of another party to pay for 'bodily injury' or 'property damage' to a third person or organization." [*Id.*].

The fact that the Mitsui policy contained an "Additional Insured" blanket endorsement, however, does not amount to proof that Bulldog complied with the contractual requirement to explicitly name LG&E as an additional insured. [*see* DE 1-1 at 36, ¶ G4.2]. The Mitsui letter contains no evidence that Bulldog explicitly named LG&E as an additional insured, and in fact, the letter states that "LG&E does not qualify as an additional insured" because "the GCA indemnity terms do not bring the contract within the Policy's definition of 'insured contract.'" [*Id.* at 118].

20

Accordingly, dismissal of the breach of contract claim based solely on the Mitsui letter would be improper. The Court therefore denies Bulldog's motion to dismiss as to Count II.

### III.    CONCLUSION

For all these reasons, the Court **DENIES** Mitsui's motion to stay proceedings [DE 31] and **DENIES** Bulldog's motion to dismiss [DE 20].

Rebecca Grady Jennings, District Judge
United States District Court

March 20, 2026

21